In the District Court of the United States
For The District of South Carolina
BEAUFORT DIVISION

| | | |
|---|---|---|
| **JEFFREY D. BLANTON,** | ) | Civil Action No. 9:07-0380-DCN-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

## I.  INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02, D.S.C.,

concerning the disposition of Social Security cases in this District, and Title 28, United States

Code Section 636(c).  The plaintiff, Jeffrey D. Blanton (the "Plaintiff" or "Claimant"), filed

this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to obtain judicial review of a final decision of the Commissioner of Social Security

(the "Commissioner") denying his claim for supplemental security income ("SSI") benefits

under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f.

---

[1]    This case was filed on February 8, 2007.  On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Michael J. Astrue is substituted for Linda S. McMahon, Acting Commissioner of Social
Security, as the defendant in this action.  No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Page 1 of  32

## II.  ADMINISTRATIVE PROCEEDINGS

On November 22, 2004, Plaintiff protectively filed for SSI alleging disability since January 1, 2000, due to the injuries received in an automobile accident in 1989 that had worsened over the years.[2]  (Tr. 109-117)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 33-39, 42-44)  Plaintiff appeared with his attorney, George Thomason, at a hearing on May 11, 2006 in Greenville, before Administrative Law Judge Karen H. Baker (the "ALJ").  (Tr. 213-82)  Testimony was taken from the Plaintiff, and from Kathleen Robbins, a vocational expert (the "VE").  On July 24, 2006, the ALJ issued a decision finding that Plaintiff was not disabled because he could perform work existing in the national economy.  (Tr. 16-28)  On January 12, 2007, the Appeals Council denied review of the Plaintiff's case (Tr. 6-9), thereby making the ALJ's decision the Commissioner's final decision for purposes of judicial review.  *See* 20 C.F.R. § 404.1481 (2007).  Therefore, the case is ripe for judicial review under § 205(g) of the Act, 42 U.S.C. § 405(g).

### III.  BACKGROUND TO THE CLAIM

#### A.  Documentary Evidence



Plaintiff was born on October 24, 1966.  (Tr. 221)  He has an eleventh grade education and worked in the past as a sheet rock hanger/carpenter and sheet rock helper.  (Tr. 91-108, 113-15, 221-223, 267)  In 1989, Plaintiff was injured in a car accident.  Upon arrival at the

---

[2]    The relevant time period for purposes of this case commences in November 2004, as Plaintiff cannot receive SSI benefits for any month prior to the month he filed his application. See 20 C.F.R. §§ 416.305; 416.335 (2007); see also Tr. 217 (Plaintiff's agreement to amend his onset date to November 2004).

hospital, Plaintiff had a blood alcohol level of .129, was "totally incoherent," and was

responsive only to pain stimuli.  "CT scan[s] of the head, chest, and abdomen revealed only

the pulmonary contusion of the right lung" and cervical spine x-rays were "essentially

negative."  Physicians diagnosed closed head trauma with a severe concussion, fracture of the

right scapula and right pulmonary contusion.  (Tr. 168-81)  Plaintiff later described his

injuries to examining physicians as a closed head injury and fractures of the lumbar and

cervical spine, right shoulder, and right ankle (*See* Tr. 120, 133-34, 155, 158-59) and also

reported being immobilized for two weeks, as well as being in a coma for "a while" (Tr. 155),

six days (Tr. 192), three weeks (Tr. 239), and six months (Tr. 133).  He claimed he had to

relearn everything when he awoke (see Tr. 120, 133-34, 155, 158-59), but medical evidence

of these claims do not appear in the record.

Plaintiff received substance abuse treatment from December 2001 to January 2002.

Upon discharge, his counselor recommended he obtain appropriate employment.  (Tr. 182-84)

It appears from the record that Plaintiff had no further medical treatment for over two years,

until April 14, 2004, when a physician completed a medical assessment for vocational



rehabilitation.  The physician noted Plaintiff had been arrested 17 times, had recently served

five months in prison on a parole violation, and had not used drugs or alcohol since April 1,

2004.  The examination was unremarkable, and the physician noted that, from a psychiatric

standpoint, Plaintiff was "much improved over events a year ago - Has served time since then

[and] is divorced . . . ."  The physician diagnosed alcohol abuse, history of cocaine abuse and

a depressive reaction relating to family problems, and he recommended a counseling program and job placement. (Tr. 118-19)

On February 10, 2005, Plaintiff presented to State agency examiner Larry Korn, D.O., for a physical examination. (Tr. 120-123) Plaintiff complained of low back pain with occasional shooting pain down the legs with a lot of bending; right shoulder pain exacerbated by cold temperatures and usage; and "some mental health issues [including poor short term memory, confusion and irritability] due to the concussion sustained in the motor vehicle accident." Plaintiff said he had difficulty bending, sweeping, and mowing the lawn, and that he could not raise his right shoulder very high. Dr. Korn noted Plaintiff took only over-the-counter medication and could not afford medical care. Plaintiff was fully oriented with a "seemingly normal" mood. He was able to squat and arise, tandem walk, walk on his heels, and walk on his toes with some back pain. He had a normal gait, limited right shoulder range of motion with no signs of impingement, limited supination of the right elbow, intact wrist motion, full finger range of motion, full lower extremity strength and range of motion, normal spinal curvature; and good cervical flexion with limited cervical extension and rotation. He exhibited "quite inconsistent" lumbar range of motion, and Dr. Korn noted the exam was positive for all Waddell signs.[3] Dr. Korn diagnosed possible post-traumatic degenerative joint disease of the right shoulder and chronic low back pain and concluded:

---

[3]    "Waddell signs are a group of physical signs . . . in patients with low back pain. They are thought to be indicators of a non-organic or psychological component to pain. Historically they have been used to detect 'malingering' in patients with back pain[.]"
See http://www.answers.com/topic/waddell-s-signs.

[Plaintiff] may have some difficulty performing vigorous overhead maneuvers with the right arm, though the only objective findings to correlate with that are his limited active motion demonstrated.

Low back measurements are of no value due to the marked inconsistency and lack of hip and sacral motion utilized in demonstration. Therefore, I will not comment on any limitations based on his low back complaints.

(Tr. 120-23)

On February 28, 2005, State agency physician Stephen J. Fass, M.D., reviewed Plaintiff's records and prepared a Physical Residual Functional Capacity Assessment. Dr. Fass found Plaintiff was restricted to medium work, could lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk or sit about six hours each in an eight-hour workday; frequently climb ramps and stairs, kneel, crouch and crawl; occasionally balance and stoop; and never climb ladders, ropes or scaffolds. Dr. Fass also found that Plaintiff was limited to frequent repetitive pushing and pulling movements and occasional overhead reaching with his right shoulder, but had unlimited reaching with his left shoulder. (Tr. 124-131) Dr. Fass also noted that the objective medical evidence did not support the restrictions to the degree or severity alleged, and noted his concern about Plaintiff's "questionable credibility." (Tr. 129)



On May 18, 2005, Plaintiff presented to James N. Ruffing, Psy.D., in Spartanburg for a psychological evaluation due to allegations of a closed head injury after a motor vehicle accident. (Tr. 132-36) Plaintiff told Dr. Korn that he had been in a coma for six months following the accident, and when he awoke he had to relearn his name and the names of family members. (Tr. 133) Plaintiff said he attended high school in Gaffney through the 12th grade, but did not graduate because of "sex, drugs, and rock and roll," that he had two

previous DUIs, although he denied alcoholism in his past, that he last consumed alcohol around December 2004, and that he currently smoked one-half to one pack of cigarettes per day. He said he last worked in construction two to three years prior, and had been involved with vocational rehabilitation off and on (for approximately two years) until December 2004 (although Dr. Ruffing noted there were no records from vocational rehab). Dr. Ruffing noted Plaintiff was able to care for his personal needs, attend church two to three times a month, go to the store, mow the grass, and help prepare meals and clean, but could not do laundry and did not drive. He did not pay bills because he lived with his parents. He had a verbal IQ of 83, a performance IQ of 78, and a full-scale IQ of 79, which Dr. Ruffing thought accurately represented his current level, and placed him in the borderline range of intellectual functioning. On memory testing, Plaintiff demonstrated some difficulty in the ability to learn new information but good capacity for personal and current information, strong orientation skills, strong mental control and good capacity to attend to, retain and recall both visually and auditorily presented information. Additional testing showed Plaintiff read at the seventh grade level, which meant "[h]e likely has the capacity to complete a job application form on his own and read text such as a newspaper article or an instruction manual. These findings are not suggestive of functional illiteracy." (Tr. 135) Furthermore, Plaintiff's results on the Bender Gestalt Visual-Motor Test were not suggestive of perceptual-motor dysfunction. Dr. Ruffing diagnosed :



> Borderline to low-average levels of intellectual capacity. Evidence did not exist for a memory disorder despite his complaints. I was not able to find evidence for emotional dysfunction. Most salient for this individual from this exam are possible impulse control issues with inappropriate comments at times and some hyperkinetic-type behavior, though it is not clear if

this represents his personality functioning, some anxiety with the testing environment or sequealae to his stated traumatic brain injury. He does maintain minimal faculties necessary to manage his finances, if awarded benefits. (Tr. 135)

On March 14, 2005, Barry Waddell, Plaintiff's vocational counselor, stated that Plaintiff had difficulty comprehending and concentrating and required close supervision. He felt Plaintiff could not "hold down a job at th[at] time" and that Plaintiff's "problems probably stem[med] from [his] past and most likely continued use of drugs and alcohol." (Tr. 89)

On June 21, 2005, State agency psychologist Margaret Moore, Ph.D., reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment. (Tr. 136-139) She found Plaintiff was "moderately limited" in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and was "not significantly limited" in the other sixteen (16) areas of work-related mental functioning. (Tr. 136-137) She concluded: "[m]ental status evidence and [activities of daily living] indicate the ability to perform simple, unskilled work as long as the claimant is not in constant contact with the general public." (Tr. 138)

On June 21, 2005, consultant Xanthia Harkness completed a Psychiatric Review Technique Form (Tr. 140-153), which indicated that from January 1, 2000 to June 21, 2005, Plaintiff had "mild" restrictions in activities of daily living; "moderate" difficulties maintaining social functioning; "moderate" difficulties maintaining concentration, persistence

and pace; and no extended episodes of decompensation. (Tr. 150) Ms. Harkness stated that the Plaintiff was capable of simple tasks. (Tr. 152)

On September 21, 2005, Plaintiff presented to Richard B. Bannon, M.D., of Foothills Family Medicine in Pacolet, for a physical examination at the request of Plaintiff's attorney. (Tr. 155-156) Plaintiff was not on any medications. He reported to Dr. Bannon that he had been in a motor vehicle accident in 1989 where he sustained multiple injuries and was "in a coma for a while." (Tr. 155) Plaintiff stated he had a closed head injury and multiple fractures including two vertebrae in the lumbosacral area, several fractures around the right shoulder and the right ankle. He told Dr. Bannon he had residual problems concentrating, remembering, becoming confused, and following instructions. He also reported residual low back pain, right shoulder pain and weakness, and right foot and ankle pain and weakness, limiting his ability to engage in repetitive activities, bending, or prolonged standing. Dr. Bannon noted Plaintiff "resist[ed]" neck movements due to pain, and exhibited decreased strength in his right arm, marked decreased strength in his right hand with limited range of motion secondary to pain, and pain and weakness in his right ankle. (Tr. 155-156) Dr. Bannon concluded:



> [Plaintiff had a] [m]otor vehicle accident in 1989 with severe trauma including closed head injury, right shoulder trauma, neck trauma, lumbosacral trauma, and right ankle trauma. Since that time [Plaintiff] has had marked decreased [sic] in strength and limitation of movement in these areas. He has also exhibited decreased ability in cognitive functions. He lacks the ability to focus or follow simple commands. In looking over his old records, he has been found to have low normal IQ at 79. He has problems functioning at that level. (Tr. 156)

On October 31, 2005, Plaintiff presented to Luther Diehl, Ph.D. in Spartanburg for a psychological evaluation. (Tr. 157-167) Plaintiff alleged difficulty concentrating, visual

problems, and numbness in his hands.  He attributed these difficulties to the motor vehicle

accident in 1989, relating that he was in a coma, his back was broken, and his right arm was

fractured in several places.  (Tr. 159)  The medical records from the motor vehicle accident

were not available to Dr. Diehl.  (Tr. 159)  Plaintiff smoked one pack of cigarettes per day

and generally had about three drinks per week, but had not had alcohol for the past three

weeks.  (159-160)  With respect to daily activities, Plaintiff has been living with his parents

since 2000.  His mother cooked the meals.  Plaintiff sometimes cut the grass, helped his

mother load the dishwasher, did some cleaning, drew a little bit, watched about 5-6 hours of

television each day, and enjoyed being outside.  He went to Wal-Mart, attended church, went

out to eat, visited family members, and camped.  (Tr. 162-163)  He had a verbal IQ of 70, a

performance IQ of 81, and a full scale IQ of 74, placing him in the borderline range of

intellectual ability.  (Tr. 164)  He correctly answered 12 of 15 questions on memory testing

and read at a second grade level.  (Tr. 165)  Tests showed a high level of anxiety and "mild"

depression, and Dr. Diehl noted Plaintiff had "no particular physical concerns other than

some fatigue."  (Tr. 164)  He concluded:

> [Plaintiff] appears to be a man who does experience fairly significant anxiety, probably best described as generalized in nature and likely to adversely affect his functioning in social and work situations. . . . From a cognitive standpoint, [Plaintiff] does display borderline intellectual functioning, a fairly consistent pattern now noted in two evaluations.  He does seem to have some fluctuation in his attention and concentration as noted during this evaluation.  Perceptual motor abilities seem to be generally within normal limits though on the other hand he performed rather poorly on paper and pencil tasks.  Reading and writing skills are substantially below expected levels and raise some questions as to whether he was performing particularly well during his years in school.  This would certainly contribute to difficulties in functioning in a job setting which required even fairly basic academic abilities.  Findings suggest that [Plaintiff] would have some difficulties in effectively reading simple information and writing effectively in simple sentences.  (Tr. 165-166)

Dr. Diehl recommended an outpatient psychiatric assessment and anxiety medications. He diagnosed generalized anxiety disorder; alcohol abuse, in remission; mathematics disorder; disorder of written expression; nicotine dependence; borderline intellectual functioning with avoidant and dependent personality features; and a GAF score of 55.[4]  Dr. Diehl also indicated that with regard to Listing 12.06 for anxiety disorders, Plaintiff had a generalized anxiety disorder resulting in "marked" difficulties in maintaining social functioning and in maintaining concentration, persistence and pace.  (Tr. 167).

## B.  Administrative Hearing Testimony

At the administrative hearing on May 11, 2006 before ALJ Baker, Plaintiff testified he completed the 11th grade and had taken some special education classes.  (Tr. 221-22).  He said he quit school because he missed too many days and went to work in the cotton mill.  (Tr. 223)  His ex-girlfriend was seeking child support.  (Tr. 224-27)  He was currently involved in vocational rehabilitation and had worked a couple times for vocational rehabilitation between 2002 and 2004.  (Tr. 228-29)  He had worked "over a year or two ago" helping a friend from church sweep for a few weeks.  (Tr. 229-30)  He also had worked in construction and performed some carpentry work for his brother-in-law off and on for 18 years.  (Tr. 231-234)  He said he last worked about year and a half prior to the hearing.  (Tr. 228, 234-35)

---

[4]    A Global Assessment of Functioning 3 (GAF) score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  See American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. 1994).

With respect to his impairments, Plaintiff testified he injured his head, arm, back, leg, foot, lung, and kidney in the 1989 motor vehicle accident. (Tr. 235)  He said he hit his head and was in a coma for about three weeks following the accident. (Tr. 239)  He was in the hospital in Gaffney overnight, then transferred to Spartanburg. (Tr. 239). He testified he had not worked for any length of time since the accident and that he could not work due to "my arm, my back, my concentration, my head" and his right shoulder. (Tr. 235-36, 240, 242)  He said he had right upper extremity pain and numbness causing difficulty gripping, reaching overhead, taking the lid off a jar, using a screwdriver and holding a pencil. (Tr. 236-237)  He said he could pick up a gallon of milk with his right arm on a good day and that he did not have problems with his left arm. (Tr. 238)  He said he did not injure his neck in the accident, but that it hurt occasionally "from like sleeping on it or a creek [sic] or something". (Tr. 239)  He testified that he was treated for a broken tailbone and head lacerations after falling off a child's bicycle about six months before the hearing. (Tr. 254-56, 258-59)  He said he also "had a car wreck or two" since April 2005, but then said he had not been in a wreck since he applied for benefits. (Tr. 255-56)

Plaintiff testified he no longer drank alcohol, but then said he had "a few beers a couple months ago with the guys" and drank alcohol "just once in a while." (Tr. 242-243)  He explained "I mean, one or two beers and be done with it, but there's been days where I probably drank a case." (Tr. 243-244)  He said his vocational rehabilitation counselor sent him for alcohol counseling (Tr. 241) and that he underwent alcohol abuse treatment in 2004.

(Tr. 257)  He also said he had not drunk to the point of intoxication "[s]ince Christmas".  (Tr. 244)

Plaintiff testified he served "a year or two" in prison for domestic violence (Tr. 246) and got out of prison after serving five months for a parole violation in April 2004.  (Tr. 247) He said he had been arrested for drugs and stealing his dad's tools several years earlier.  (Tr. 251-252, see also Tr. 257)  He also had gotten two DUIs, the most recent being four or more years ago, and had not had any problems with the law since the previous summer.  (Tr. 245-246, 252-53)

Plaintiff worked as a carpenter for family members after getting out of prison, but did not make enough money to "make a living."  (Tr. 247-49)  He said he felt his skills were worth $15.00 per hour, depending on the job, but that he had not made that much for six to eight years.  (Tr. 250)

Kathleen Robbins, Ph.D., a vocational expert who also was present at the hearing, testified Plaintiff's past work was heavy in exertion and semi-skilled to skilled.  (Tr. 267) The ALJ posed the following hypothetical:

> And I want you to assume that the claimant has the following limitations for the first hypothetical. I want you to assume that he's limited as in [Dr. Fass' assessment at Tr. 124-31], which is the State Agency's physical RFC to performing work where he would lift no more than 50 pounds occasionally, 25 frequently, sit, stand, or walk six hours each in any eight-hour day, and would need to limit repetitive movements involving his right shoulder to frequent, frequent instead of constant. . . . One-third to two-thirds of the day instead of constant. Okay. No ladder climbing, only occasional balance and stoop, but he can crouch. And overhead reaching, overhead work with the right arm is only occasional. Okay. So he can reach forward with the arm, you know, like on a bench level frequently . . . but the overhead only occasionally. I want you to further assume that the claimant has limitations found by the State Agency in [Tr. 136-69], which is the mental RFC, which would indicate that he should – no ongoing public contact and he can perform simple, unskilled work. (Tr. 268)

Dr. Robbins testified such an individual would be unemployable due to the limitation to unskilled work with no public contact or repetitive movements. (Tr. 268-69) In response to a second hypothetical, Dr. Robbins testified that an individual who had difficulty performing vigorous overhead maneuvers but no restriction on using the shoulder below overhead level as set forth by Dr. Korn (Tr. 120-23), and with the mental limitations in Dr. Moore's residual functional capacity assessment (Tr. 136-39), could perform the unskilled light and medium jobs of bench assembler, packer, hand packer, and kitchen helper/dishwasher, which existed in significant numbers in the national economy. (Tr. 270-73)

In response to a third hypothetical, Dr. Robbins testified that someone with marked decreased strength and difficulty using the right hand as set forth by Dr. Bannon (Tr. 155-56) and the previous mental limitations, could not work. (Tr. 273) In response to questions from Plaintiff's attorney, Dr. Robbins testified that moderate limitations in attention, concentration, persistence, or pace, in addition to Dr. Fass' physical limitations (Tr. 124-31), would limit the individual to simple, unskilled, repetitive tasks with possible special supervision, but would not preclude employment. (Tr. 275) Dr. Robbins testified a GAF score of 55 would indicate that a structured work environment would be necessary, but not to the extent the individual would be unable to keep a job. (Tr. 276)

## IV. THE COMMISSIONER'S FINDINGS

In making the determination that the Plaintiff was not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  It is unclear from the evidence of record whether the claimant has engaged in substantial gainful activity since November 1, 2004, the alleged onset date (20 C.F.R. 416.920(b) and 416.971 *et seq.*).  (Tr. 20)

2.  The claimant has the following severe impairments:  substance abuse, both alcohol and drugs, borderline intellectual funct8ioning, and status post remote (1989) motor vehicle accident with residual shoulder limitations (20 C.F.R. 416.920(c)).  (Tr. 21)

3.  The evidence does not support a finding that the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).  (Tr. 24)

4.  After careful consideration of the entire record, I find that the claimant has the physical residual functional capacity to perform work that is consistent with the limitations set forth at Exhibit 2F, page 4, and the mental limitations set forth in Exhibit 5F.  (Tr. 25)

5.  The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).  (Tr. 27)

6.  The claimant was born on October 24, 1966 and was 38 years old on the alleged onset date, which is defined as a younger individual (20 C.F.R. 416.963).  (Tr. 27)

7.  The claimant has a limited education and is able to communicate in English (20 C.F.R. 416.964).  (Tr. 27)

8.  The claimant has no transferable job skills according to the vocational expert; see also SSR 82-41.  (Tr. 27)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.960(c) and 416.966).  (Tr. 27)

10. The claimant has not been under a "disability," as defined in the Social Security Act, from November 1, 2004 (20 C.F.R. 416.920(g)), through the date of this decision.  (Tr. 28)

## V.  EVIDENCE SUBMITTED TO THE APPEALS COUNCIL AFTER THE ALJ'S DECISION

### A.  The Second Examination by Dr. Bannon



On August 30, 2006, Plaintiff again was seen by Dr. Bannon at the request of Plaintiff's

attorney.  Plaintiff told Dr. Bannon he smoked a pack of cigarettes per day and no longer used

drugs or alcohol. He exhibited marked limitation of movement of the right shoulder, an inability

to lift his right arm over his head, and marked weakness in grip, flexion, and extension in the

right arm. Plaintiff also exhibited decreased strength in his back and legs, decreased but intact

sensation, decreased lower extremity strength, and the inability to walk on his heels and toes.

Dr. Bannon concluded Plaintiff could not perform mentally or physically demanding work due

to the effects of his closed head trauma, shoulder injury, back and leg pain and weakness, low

IQ, and anxiety. (Tr. 192-193).

### B. Testimony from Vocational Expert Benson Hecker, Ph.D

On September 20, 2002, Plaintiff's counsel deposed Benson Hecker, Ph.D., a vocational

expert. Dr. Hecker testified he reviewed Plaintiff's records, including the August 2006 report

from Dr. Bannon and the ALJ's 2006 decision. (Tr. 199-200) He testified Plaintiff's past work

was light to very heavy in exertion and unskilled to semi-skilled. (Tr. 201) Plaintiff's counsel

presented the following hypothetical:

> Assume that the claimant according to [Tr. 124-31], could lift 50 pounds occasionally, could frequently lift 25 pounds, could only do occasional overhead reaching or lifting and could do no repetitive activities because of an impaired shoulder. These are the functional limitations that were given to the vocational expert at the hearing. *Further assume that the additional functional restrictions are found at the top of page 8 [Tr. 25] that were not given to the vocational expert at the hearing. Assume at the top of page 8 of the hearing decision [Tr. 25] the ALJ found that the claimant had a medically severe mental impairment that would cause him to have mild restriction in activities of daily living, moderate limitations in social functioning and moderate difficulty in maintaining concentration, persistence or pace and that he has had no extended episodes of decomposition.* Considering those factors, do you have an opinion based upon a reasonable degree of professional certainty as to whether the claimant can do the jobs that were enumerated by the [ALJ] on page 11 of the hearing decision [Tr. 28]?



(Tr. 201-02) (emphasis added). Dr. Hecker testified such an individual could not perform any

of the named jobs due to the physical requirements of the combination of rapid repetitive use of

the bilateral upper extremities for reaching, pushing, pulling, fine finger dexterity and gross

dexterity and the psychological requirements of concentration, persistence and pace in those jobs. (Tr. 203-05)  He testified even if the individual were able to understand instructions for simple unskilled jobs such as dishwasher or hand packer, the individual's limitations in pace would preclude him from performing those jobs. (Tr. 205-06).  Dr. Hecker concurred with Dr. Robbins' testimony that an individual "restricted in the right shoulder in performing repetitive activities this impaired bilateral dexterity," could not work.  (Tr. 206)  He testified that individuals must be able to use their bilateral upper extremities and concentrate, persist and maintain pace in order to maintain productivity in unskilled jobs.  (Tr. 206-08)  He testified that the ability to perform routine daily chores would not change his conclusions because "there is just no correlation between the capacity to work and perform activities of daily living because the discretionary factors are so different".  (Tr. 208-09)

## VI.  THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability."  42 U.S.C. § 423(a).  Disability is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can expected to result in death or which has lasted or can be expected to last for at least 12 continuous months.[5]

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658

---

[5]    *See* 42 U.S.C. § 423(d)(1)(A) (2005); 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212 (2002).

F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and (5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920(a)(4). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. See 20 C.F.R. § 416.920(a).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp.2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

## VII.  SCOPE OF REVIEW



Under the Social Security Act, 42 U.S.C. § 405(g), this Court's scope of review of the Commissioner's "final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).

The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405(g);      *Blalock v.*

*Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Teague v. Califano*, 560 F.2d 615, 618 (4th Cir. 1977). Such evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Shivey v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). It is the duty of the ALJ reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456. In reviewing for substantial evidence, the court does not weight conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.* If substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

### VIII.  ANALYSIS OF THE ALJ'S DECISION

Consistent with the five step "sequential evaluation" process set forth at 20 C.F.R. 416.920, at Step One, the ALJ gave Plaintiff "the benefit of the doubt [and] proceed[ed] with the remaining steps of the sequential evaluation," even though Plaintiff's earnings record showed he worked at some level during 2004. (Tr. 20-21) At Step Two, the ALJ found Plaintiff's substance abuse, borderline intellectual functioning, and status post remote vehicle accident with residual shoulder limitations were severe[6] impairments. (Tr. 21-24) The ALJ

---

[6]    An impairment is severe when it is more than a slight abnormality that has more than a minimal effect on the ability to do basic work activities. *See* Social Security Ruling (SSR) 96-3p; 20 C.F.R. §§ 416.920(a), 416.921 (2007). Conversely, "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.1984) (citations and internal punctuation omitted).

found at Step Three that Plaintiff's impairments did not meet or equal any impairments in the

Listings at 20 C.F.R. pt. 404, subpt. P, app. 1 so as to be presumptively disabling.  (Tr. 24-25)

The ALJ assessed Plaintiff's residual functional capacity by evaluating the medical evidence

and Plaintiff's subjective complaints, finding he was "not credible" to the extent he alleged total

disability.  (Tr. 25-26)  After considering all the evidence, the ALJ found Plaintiff had a residual

functional capacity "consistent with" Dr. Korn's physical limitations (Tr. 122-23) and Dr.

Moore's mental residual functional capacity assessment (Tr. 136-39), *i.e.* Plaintiff could

perform simple work that allowed for moderate limitations in his ability to understand,

remember, and carry out detailed instructions; maintain attention and concentration for extended

periods; and interact appropriately with the general public and did not require "vigorous

overhead maneuvers with the right arm".  (Tr. 25)  At Step Four, the ALJ found Plaintiff could

not perform his past relevant work.  (Tr. 27)  The ALJ then relied on vocational expert

testimony at Step Five to conclude there were jobs in the national economy Plaintiff could

perform, including the jobs of bench assembler, packer, and kitchen helper/dishwasher.  (Tr.

27-28)

## IX.  PLAINTIFF'S OBJECTIONS

The Plaintiff raises two objections in his Brief:

I.      Substantial evidence from a vocational expert does not support a finding that the Plaintiff
        can work as a bench assembler, packer, or kitchen helper/dishwasher (medium work)
        when his right arm/shoulder problems are coupled with impaired concentration,
        persistence, or pace.

II.     The Appeals Council erred by failing to grant review when new and material evidence
        proves the Plaintiff incapable of doing the vocations identified by the ALJ in the hearing
        decision.

## X.  DISCUSSION OF PLAINTIFF'S OBJECTIONS

I.    Substantial evidence from a vocational expert does not support a finding that the Plaintiff can work as a bench assembler, packer, or kitchen helper/dishwasher (medium work) when his right arm/shoulder problems are coupled with impaired concentration, persistence, or pace.

Plaintiff first contends that substantial evidence does not support the ALJ's determination of the Plaintiff's residual functional capacity.  As noted above, the Plaintiff claims disability due to the residual effects of a car accident that took place in 1989, more than 15 years before his alleged onset date.  The Commissioner points out that after his 1989 hospitalization, Plaintiff did not seek further treatment for his allegedly disabling impairments until April 2004, just a few months before he filed his application for benefits.  (Tr. 25)  *See, e.g, Mickles v. Shalala*, 29 F.3d 918, 929-30 (4th Cir. 1994) (a failure to seek medical attention may support a finding that a claimant's impairments are not of disabling severity); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (it is Plaintiff's burden to present evidence proving his disability).  Moreover, although the evidence from the 1989 hospitalization showed Plaintiff suffered a concussion, a fractured right shoulder and a contusion on his right lung, it failed to corroborate the nature and extent of impairment Plaintiff claimed.  (Tr. 25, 168-81)  For instance, although Plaintiff reported he was in a coma following the accident, his claims as to the duration of the coma varied widely (from six days to six months (see Tr. 133, 155, 192, 239)), and treatment notes merely indicated he was intoxicated and initially only responsive to pain stimuli following the accident.  This evidence also failed to support Plaintiff's claims to examining physicians that he injured his neck and ankle in the accident, as the only orthopedic injury revealed by the 1989 treatment notes was the right shoulder injury; cervical x-rays were negative; and Plaintiff later testified he did not injure his neck in the accident, but that his neck hurt occasionally "from sleeping on it or a creek [sic] or something".  (Tr. 25-26, 168-91, 239)



Plaintiff also testified he had been injured falling off a child's bicycle and had "a car wreck or two". (Tr. 254-259)  As the ALJ correctly noted, it therefore appeared that some of Plaintiff's physical complaints were related to short-term injuries, rather than disabling residual effects of the 1989 accident as alleged.  *See Barnhart v. Walton*, 535 U.S. 212 (2002) (Plaintiff had burden to show his impairments are so functionally limiting as to preclude him from performing any substantial gainful activity for at least twelve consecutive months).  Thus, the evidence dated prior to Plaintiff's onset date and his own testimony controverted the extent of impairment he claimed.

The later medical evidence also failed to support Plaintiff's claims of disabling functional limitations.  Since Plaintiff did not seek regular medical care, virtually all of the medical evidence in the record is from consulting or nonexamining sources, and Plaintiff's complaints to these sources and their resultant conclusions varied significantly.  The ALJ reviewing the case bears the responsibility of making findings of fact and resolving such evidentiary conflicts.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  In exercising this duty, ALJ Baker accorded the "greatest weight" to Dr. Korn's opinion as to Plaintiff's physical impairments.  (Tr. 26)  *See Perales*, 402 U.S. at 402 (opinion of examining physician may constitute substantial evidence to support ALJ's decision).  The ALJ also adopted Dr. Moore's mental residual functional capacity and noted that this assessment was supported by Dr. Ruffing's findings.  (Tr. 25-26)  *See id.; see also, e.g., Smith*, 795 F.2d at 345-46 (opinion of non-examining physician can constitute substantial evidence to support the decision of the Commissioner).  In so doing, the ALJ declined to accept the findings of Drs. Bannon and Diehl.  *See, e.g., Craig*, 76 F.3d at 590 (if a physician's opinion is not supported by clinical evidence or

is inconsistent with other substantial evidence, it should be accorded significantly less weight).

The ALJ observed, "it is apparent that [Plaintiff] was focused on his disability claim when he

went to see Dr. Diehl and Dr. Bannon, since much of what he reported is either contradicted by

other records or absent from the rest of the record". (Tr. 26)  Based upon the evidence, the ALJ

could, and did, reasonably question Plaintiff's motivation for obtaining benefits. *See Jolley v.*

*Weinberger*, 537 F.2d 1179, 1181 (4th Cir. 1976) (inferences can be properly drawn from record

evidence); *see also Mickles*, 29 F.3d at 925-26 (in assessing credibility of the severity of

reported subjective complaints, consideration must be given to the entire record, including the

objective and subjective evidence); *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005)

(ALJ could reject claimant's testimony because it was inconsistent with the objective medical

evidence).

With respect to Plaintiff's physical impairments, in April 2004, the state vocational

rehabilitation physician did not identify any physical complaints or problems and accordingly

recommended Plaintiff start a job placement program (Tr. 25, 118-19).  *See, e.g., Mink v. Apfel*,

2000 WL 665664, *1 (4th Cir. May 22, 2000) (lack of medical restrictions supported decision

that claimant was not disabled).  In February 2005, Dr. Korn noted Plaintiff's back examination

was positive for all Waddell's signs and was of "no value" due to the "marked inconsistencies"

Plaintiff demonstrated on range of motion testing.  Dr. Korn observed that Plaintiff's only

limitation was for "difficulty performing overhead maneuvers with the right arm." (Tr.

120-123)  The ALJ properly incorporated these findings, as they were based on a

comprehensive examination and most consistent with the record as a whole.  *See Mickles*, 29

F.3d at 925-26 (in assessing credibility of the severity of reported subjective complaints,

consideration must be given to the entire record, including the objective and subjective evidence); *Johnson*, 434 F.3d at 658 (the ALJ could reject claimant's testimony because it was inconsistent with the objective medical evidence).

The ALJ also considered the February 2005 opinion of Dr. Fass, the State agency physician, but he found the limitations proposed by Dr. Fass, including the limitation to frequent repetitive movements with the right arm, were "not supported by the expanded record." (Tr. 26, 124-31). *See, e.g., Craig*, 76 F.3d at 590 (if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight). For instance, although Plaintiff had limited range of motion in his right shoulder on exam, there were no signs of impingement, and he retained intact wrist motion and full finger range of motion. (Tr. 120-23) *See Craig*, (lack of objective findings supported ALJ's decision). As discussed above, Plaintiff admitted he engaged in activities requiring use of his right arm, such as mowing the lawn. In addition, contrary to the findings of Dr. Korn (as well as the April 2004 vocational rehab agency examining physician), Dr. Bannon found in September 2005 that Plaintiff had markedly decreased strength and limitation of movement in his neck, back, right arm and right ankle and that he lacked the ability to focus or follow simple commands due to his 1989 auto accident. (Tr. 23, 26, 155-56) However, as the ALJ noted, Dr. Bannon's limitations appeared to be based primarily on Plaintiff's subjective complaints, and Plaintiff's "presentation to Dr. Bannon was in direct conflict to his presentations to Drs. Korn and Ruffing." (Tr. 23, 25) *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (that physician's diagnosis was based largely upon claimant's self-reported symptoms allowed ALJ to assign that physician's opinion lesser weight); *Jolley v. Weinberger*, 537 F.2d 1179, 1181

(4th Cir. 1976) (objective medical evidence, as opposed to claimant's subjective complaints, supported an inference that he was not disabled). The ALJ further noted Plaintiff had not complained of lower extremity pain at his previous two exams, and, as discussed above, Dr. Bannon's findings as to ankle and neck pain from the 1989 accident were contradicted by the other evidence of record, including Plaintiff's own testimony. Significantly, too, as of October 2005, Plaintiff had no physical complaints other than fatigue. (Tr. 157-67). *See Craig*, 76 F.3d at 590 (physician's opinion that is not supported by clinical evidence or is inconsistent with other substantial evidence should be accorded significantly less weight). The ALJ properly considered the evidence from Drs. Korn, Bannon, and Fass. The ALJ further noted that there was "no evidence that the claimant has suffered pain or limitations of such severity that he has sought emergency room treatment, 'pain management,' the services of any physician, or treatment at a 'free' medical clinic". (Tr. 25) *See, e.g., Mickles*, 29 F.3d at 929-30 (failure to seek medical attention inconsistent with complaints of disabling pain); *Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1993) (lack of hospitalization or other significant treatment constitutes specific evidence which supports an acceptable credibility determination that symptoms are not disabling); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (pain is not disabling per se).

The ALJ correctly concluded that "[a]lthough the claimant alleges that he suffers disabling limitations related to back, neck, and shoulder pain and right foot weakness and pain, this is not supported by the objective evidence." (Tr. 25) *See, e.g., Jolley*, 537 F.2d at 1181 (objective medical evidence, as opposed to claimant's subjective complaints, supported an inference that he was not disabled).

Finally, as to Plaintiff's mental impairments, the ALJ acknowledged Plaintiff had borderline intellectual functioning and possible residual effects of his prior concussion. (Tr. 21) Consistent with the findings of Drs. Moore and Ruffing, the ALJ then limited Plaintiff to unskilled work that did not require ongoing public contact. (Tr. 23, 25-26, 132-35, 136-49) *See, e.g., Smith*, 795 F.2d at 345-46 (opinion of non-examining physician can constitute substantial evidence to support the decision of the Commissioner). The ALJ also expressly considered Dr. Diehl's conflicting opinion that Plaintiff had marked mental limitations in making his assessment, but gave it "no weight" because it was based on subjective information and inconsistent with the other evidence of record, including that from Drs. Moore and Ruffing. (Tr. 24, 26, 157-67) *See, e.g., Mastro*, 270 F.3d at 178 (that physician's diagnosis was based largely upon claimant's self-reported symptoms allowed ALJ to assign that physician's opinion lesser weight); *Craig*, 76 F.3d at 590 (physician's opinion that is not supported by clinical evidence or is inconsistent with other substantial evidence should be accorded significantly less weight). Dr. Diehl's conclusions were also inconsistent with his own finding that Plaintiff had GAF of 55, which indicated only moderate symptoms. (Tr. 24, 26, 157-67). The ALJ also found it significant that Plaintiff's substance abuse counselor felt his mental problems were likely due to past and ongoing substance abuse. (Tr. 26-27, 89)

Furthermore, Plaintiff's relatively normal daily activities-- including caring for his personal needs, attending church, going to the store, performing yard work including mowing the grass, helping to prepare meals and perform housework, going out to eat, visiting with family members and friends, riding a bicycle and camping -- were inconsistent with his claims of total disability. (Tr. 27, 132-36, 157-67, 254) Additionally, even though vocational

rehabilitation is not substantial gainful activity, Plaintiff's participation in vocational rehab further supported a finding that Plaintiff's limitations were not as severe as he alleged.  (Tr. 118-19, 132-36, 184-84, 228-35, 247-49).  *See, e.g., Johnson*, 434 F.3d at 658 (ALJ logically reasoned claimant's daily activities were inconsistent with statements of excruciating pain); *Mickles*, 29 F.3d at 921 ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life").

It is the duty of the ALJ reviewing the case, and not the responsibility of the courts, to make findings of fact and resolve conflicts in the evidence. *See Hays*, 907 F.2d at 1456; *Craig*, 76 F.3d at 589.  Here, the record as a whole substantially supported the ALJ's conclusion that Plaintiff had the residual functional capacity to perform simple work not requiring "vigorous overhead maneuvers with the right arm" or ongoing public contact.  (Tr. 25, 122-23, 136-39) Because the ALJ's finding as to Plaintiff's mental limitations is supported by substantial evidence, it will not be overturned by the Court.

Contrary to Plaintiff's argument before this Court, the ALJ properly determined that the Plaintiff could perform other work existing in significant numbers in the national economy. Pursuant to the five-step sequential analysis, once the ALJ found Plaintiff could not perform his past work with this residual functional capacity (Tr. 27), the issue became whether there were other jobs in the national economy he could perform with his limitations.  *See McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65.  In making this determination, the ALJ was entitled to rely upon the testimony of Dr. Robbins, a vocational expert.  (Tr. 28)  As noted in the decision, Dr. Robbins testified a person of Plaintiff's age, background and the residual functional capacity ultimately found by the ALJ, could perform the



unskilled light and medium jobs of bench assembler, packer, hand packer and kitchen

helper/dishwasher. (Tr. 25, 270-73) This testimony substantially supported the ALJ's

conclusion that Plaintiff could perform other work in the national economy. *See Johnson*, 434

F.3d at 659 (substantial evidence supported ALJ's decision that Plaintiff was not disabled where

hypothetical to vocational expert included all limitations that were supported by the record as a

whole).

Contrary to Plaintiff's arguments (Plaintiff's Brief at 2-5), the ALJ was not required to

accept Dr. Robbins' answers to additional hypotheticals presented at the hearing, which

included limitations that the ALJ found were not supported by the record. *See, e.g, Lee v.*

*Sullivan*, 945 F.2d 687, 692 (4th Cir. 1991) (hypothetical posed to a vocational expert must

accurately portray the claimant's individual physical and mental impairments, but it need reflect

only those impairments that are supported by the record). For instance, although the ALJ's first

hypothetical included a limitation to no more than frequent repetitive movements with the right

upper extremity, the ALJ did not ultimately find Plaintiff to be so limited. Rather, as discussed

above, the ALJ reasonably concluded that Dr. Korn's limitation from vigorous overhead

movements with the right shoulder, with no restriction in using the arm below shoulder level,

was most consistent with the record as a whole. (Tr. 26). Some of the jobs identified by the

vocational expert and accepted by the ALJ did not require more than frequent reaching,

handling, fingering or feeling. *See U.S. Dept. of Labor, Dictionary of Occupational Titles*

(DOT) (4th ed., Rev. 1991) §§ 706.684-042 (bench assembler); 706.684-022 (small products

assembler/bench assembler); 920.687-142 (prizer/loose-hand packer). *See Mickles*, 29 F.3d at

921 (affirming the denial of benefits where the ALJ erred in evaluating claimant's pain, because

"he would have reached the same result notwithstanding his initial error"); see also 20 C.F.R. §

416.966(d)(1) (2007) (ALJ may take administrative notice of data in the DOT).  Substantial

evidence supports the ALJ's determination that Plaintiff could perform work existing in

significant numbers in the national economy, and this Court will uphold the ALJ's

determination.

> II.  **The Appeals Council erred by failing to grant review when new and material evidence proves the Plaintiff incapable of doing the vocations identified by the ALJ in the hearing decision.**

As noted above, after the ALJ issued her decision on July 24, 2006, Plaintiff submitted

objections to the Appeals Council (Tr. 185-191) seeking review pursuant to 20 C.F.R. §

404.970(a).  Plaintiff submitted additional evidence to the Appeals Council in the form of (1) an

August 30, 2006 treatment note from Dr. Bannon, which addressed the functional restrictions of

Plaintiff's right shoulder (Tr. 192-193); and (2) a deposition of Dr. Benson Hecker dated

September 20, 2006, which offered rebuttal vocational evidence.  (Tr. 194-210)  Plaintiff argues

before this Court that the Appeals Council erred in finding this evidence (1) was not new and

material and (2) did not provide a basis for changing the ALJ's decision.[7]  For the reasons

discussed below, the Court finds these arguments unpersuasive.

In the present case, the Appeals Council informed the Plaintiff that it "considered the

reasons you disagree with the decision and the additional evidence listed on the enclosed Order

of Appeals Council.  We found that this information does not provide a basis for changing the

---

[7]  In unpublished opinions, two separate panels of the Fourth Circuit have held that the Appeals Council need not provide detailed reasons for finding that new evidence did not provide a basis for changing the ALJ's decision.  *See Hollar v. Comm'r of the Soc. Sec. Admin.*, No. 98-2748, 1999 WL 753999, at *1 (4th Cir. Sept. 23, 1999) (unpublished) and *Freeman v. Halter*, No. 00-2471, 2001 WL 847978, at *2 (4th Cir. July 27, 2001) (unpublished).

[ALJ's] decision." (Tr. 6-7) In other words, the ALJ's final decision remained supported by substantial evidence. (Tr. 5-9).

The Court notes that Dr. Bannon's August 30, 2006 medical report which concluded that Plaintiff could not perform mentally or physically demanding work (Tr. 192-93) was not "new" evidence in that it was substantially different Dr. Bannon's report dated September 21, 2005 (Tr. 155-156) which the ALJ had considered, discussed in the decision, and rejected on the grounds that Plaintiff made statements to Dr. Bannon about physical injuries that were not supported by medical records and that "[Plaintiff's] presentation to Dr. Bannon was in direct contradiction to his presentations to Drs. Korn and Ruffing." (Tr. 23). In her decision, the ALJ concluded Dr. Bannon's findings were not supported by the record as a whole and were based primarily on Plaintiff's subjective complaints. *See, e.g., Mastro*, 270 F.3d at 178 (fact that physician's diagnosis based largely upon claimant's self-reported symptoms allowed ALJ to assign that physician's opinion lesser weight); *see also, e.g., Wagner v. Apfel*, No. 98-2260, 1999 WL 1037573, at *3 (4th Cir. Nov. 16, 1999) (medical reports issued by treating physicians after issuance of an ALJ decision are to be treated as less persuasive than opinions issued prior to the ALJ decision) (citation omitted). The new evidence from Dr. Bannon would not have changed the ALJ's decision.

With respect to Dr. Hecker's deposition testimony, the Commissioner argues, and this Court agrees that the hypothetical Plaintiff presented to Dr. Hecker contained limitations that ALJ ultimately found were not supported by the record. For example, Plaintiff stated that the limitation for "no" repetitive activities limitation in his hypothetical to Dr. Hecker was one of "the functional restrictions that [was] given to the vocational expert at the hearing". (Tr. 202)

However, the hypothetical at the hearing contained only a limitation to "frequent" repetitive movements, and therefore was significantly less restrictive than Plaintiff's hypothetical. (Tr. 201-02, 268) Consequently, the ALJ would not have been required to accept Dr. Hecker's responses to those questions, even if the evidence had been before her. *See Lee*, 945 F.2d at 692 (hypothetical need reflect only those impairments that are supported by the record).

In addition, Plaintiff's arguments that he should be found disabled based on the mental limitations imposed in his hypothetical to Dr. Hecker are without merit.[8] Plaintiff's hypothetical incorporated "moderate" limitations in social functioning and concentration, persistence or pace from the ALJ's Psychiatric Review Technique[9] findings at page 8 of the ALJ's decision. (Tr. 25, 202). However,

> [T]he [PRTF] criteria are not a[] [residual functional capacity] assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental [residual functional capacity] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p. Therefore, it was improper for Plaintiff to incorporate the PRTF findings, rather than the residual functional capacity findings, into his hypothetical question. The ALJ, on the other hand, properly applied the PRTF findings at Step Three and incorporated the mental

---

[8]   *See* Plaintiff's Brief at 6-7.

[9]   "The psychiatric review technique described in 20 C.F.R. § [] 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings." SSR 96-8p, see 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00, et. al. (Listings for mental disorders). This "special technique" requires that the adjudicator "rate the degree of functional limitation resulting from the impairment(s)" in four functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. See 20 C.F.R. §§ 416.920a(a),(b)(1),(b)(2),(c)(3). The adjudicator rates the degree of limitation in the first three areas on a five-point scale: None, Mild, Moderate, Marked, or Extreme; and in the fourth area on a four point scale: None, one or two, three, or four or more. *See id*,. § 416.920a(c)(4).

residual functional capacity assessment into her hypothetical at Step Five. (Tr. 25) In response to the ALJ's proper hypothetical, Dr. Robbins testified an individual with the mental limitations set forth in Dr. Moore's residual functional capacity assessment could perform work in the national economy. (Tr. 270-73) Dr. Robbins later testified that moderate limitations in concentration, persistence, or pace or a GAF score of 55 (indicating moderate symptoms), would not preclude all employment. (Tr. 275-76) To any extent Dr. Hecker's testimony conflicted with Dr. Robbins' in this regard, even assuming for argument's sake that the testimony of Dr. Robbins and Dr. Hecker were entitled to equal weight, the ALJ's decision in reliance on Dr. Robbins' testimony would remain supported by substantial evidence. *See, e.g., Shively,* 739 F.2d at 989 (substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance").

After careful consideration of the record and the parties' briefs, the undersigned finds that the Commissioner's decision is supported by substantial evidence and that the correct law was applied.

## RECOMMENDATION

Based upon the foregoing, it is recommended that the **Commissioner's decision be affirmed.**

George C. Kosko
United States Magistrate Judge

November 26 2007

Charleston, South Carolina